**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

---

ELEVATE AVIATION GROUP, LLC,

     Plaintiff,

v.

KACI RINN,

     Defendant.

---

Civil Action No. _____

## **COMPLAINT**

Plaintiff Elevate Aviation Group, LLC ("EAG") files this Complaint and sues Defendant Kaci Rinn ("Rinn") and states:

## **THE PARTIES**

1. Plaintiff Elevate Aviation Group, LLC is a Florida limited liability company, which conducts business, through its subsidiaries, employees, and agents, throughout the world. EAG's principal place of business is in Miami Beach, Florida.

2. Defendant Kaci Rinn is a former employee of EAG, and upon information and belief, is a citizen and resident of the State of Texas.

## **JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1836(c) (actions arising under the DTSA); 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1367 (supplemental jurisdiction); and the doctrines of ancillary and pendent jurisdiction.

4. Venue is proper in the District of New Hampshire as the Non-Disclosure and Non-Solicitation Agreement entered into between EAG and Rinn (the "NDA"), which is central to this dispute, states that "any legal action on a controversy concerning this [NDA], or an alleged breach

of this [NDA], shall only and exclusively be brought in the jurisdiction and courts of the State of New Hampshire or the Federal District Court for the District of New Hampshire and shall not be brought in the jurisdiction or courts of any other state." (Ex. A at § 10(a)). A copy of the NDA is annexed hereto as **Exhibit A**.

5.      Moreover, the parties agreed that "the State of New Hampshire is a reasonably convenient place for the hearing and/or trial of any action on a controversy concerning this [NDA]." (Ex. A at § 10(b)).

6.      This District has personal jurisdiction over Rinn. The NDA provides that Rinn "consents, and waives objection, to personal jurisdiction in the state and federal courts of New Hampshire." (Ex. A at § 10(c)).

7.      EAG has engaged undersigned counsel and has agreed to pay counsel reasonable attorneys' fees for all services rendered in this action and otherwise in connection with enforcing the NDA between EAG and Rinn and protecting EAG's trade secrets and confidential information.

## FACTUAL BACKGROUND

### A.      EAG's Business and its Valuable Trade Secrets and Confidential Information

8.      EAG is in the on-demand air transportation business. Through its wholly-owned subsidiaries, EAG provides aircraft owners and flyers safety and value through the following services: charter flights, large group travel packages, membership opportunities, aircrafts management services, charter revenue from owned aircraft, aircraft maintenance, or aircraft acquisition and consultancy services.

9.      As part of its business, EAG has developed, and uses, various proprietary and confidential trade practices, trade materials, and other trade secrets. These trade secrets are the result of years of time, money and labor invested by EAG.

10. EAG credits much of its success to the trade secrets it has created since its inception while working with its customers and recording the individual customer's unique preferences, in addition to other types of trade secrets.

11. EAG's trade secrets include confidential and proprietary information such as customer lists, prospective customer lists, customer airplane preferences, databases, historic and dynamic pricing per customer, information encompassed in all proposals to customers and prospective customers, government bid materials, marketing and sales plans, financial information, costs, pricing information, vendor information, customer preference information, computer programs (including without limitation source code, object code, algorithms, and models), among other information and items. Included in that umbrella of trade secrets is the real time (or near real time) inquiries by EAG's customers for upcoming travel arrangements and any requests (or requirements) for specific equipment (collectively, the "EAG Trade Secrets").

12. The EAG Trade Secrets have significant economic value from not being generally known to the public or the aviation industry. This information was developed by EAG over a substantial period of time through substantial cost and investment. The information provides EAG a competitive advantage in its business, and plainly, EAG derives economic value from EAG's Trade Secrets being kept secret.

13. EAG has taken, and continues to take, extensive measures to maintain the secrecy of the EAG Trade Secrets, and to prevent disclosure of this information to the general public or the aviation industry. For example, EAG maintains secure physical premises and stores its electronic records on a secured, password-protected database. EAG utilizes two-factor authentication for all log-ins and implements conditional access policies for access to EAG's databases. Additionally, employees must meet certain minimum criteria before being hired by

EAG, and all employees are trained on EAG's data security and their obligations regarding same during the on-boarding process.

14.     Section 3(a) of the NDA sets forth the definition of Confidential Information. Specifically, "Confidential Information" is defined as:

> [EAG]'s information of commercial value or other utility in the Business, and all other information which, if disclosed without authorization, could be detrimental to the interests of [EAG], including but not limited to: customer names and lists; prospective customer names and lists; databases; information encompassed in all proposals; government bid materials; marketing and sales plans; financial information; costs; pricing information; vendor information; customer preference information; computer programs (including without limitation source code, object code, algorithms and models); trade secrets; proprietary information; Works for Hire; and all other confidential methods, concepts, know-how or ideas of [EAG].

(Ex. A at § 3(a)) (the "Confidential Information").

15.     EAG employees contractually agree that during the course of employment, employees will have and be granted access to EAG's Confidential Information and agree "not to, in any capacity, directly or indirectly, use, disclose, publish or make available to any person or entity any Confidential Information, except as may be necessary on behalf of EAG, on a 'need to know' basis", and "not to, in any capacity, directly or indirectly, access, use or copy any Confidential Information, or remove any Confidential Information from the premises or control of EAG, except as required in the performance" of an employee's duties to EAG. (Ex. A. at §4(b)).

16.     EAG employees further agree not to use or disclose such EAG Trade Secrets and/or Confidential Information (collectively, the "Information"), and that such Information is only to be used by the employee in connection with his or her work for EAG. *See generally* (Ex. A).

17.     Employees also contractually agree that, promptly upon termination, they will return to EAG all EAG property, materials, and all copies of any property or materials, including but not limited to, identification cards, files, equipment, cell phone, laptop(s), diskettes, intangible information stored on diskettes, or flash drives or on your personal computer, software programs

4

and data compiled with the use of EAG programs, software passwords or codes, copies of trade secrets and confidential information, cellular phones, credit cards, telephone charge cards, manuals, names and addresses of all EAG customers and potential customers, customer lists, customer contacts, vendors, suppliers or consultants, sales information, memoranda, sales brochures, marketing materials, business or marketing plans, reports, projections, pricing information and any and all other information or property previously or currently held or used by you that is or was related to your employment with the EAG.  (Ex. A. at §4(c)).

18.     EAG has been vigilant about protecting the secrecy of the Information due to its significant economic value to EAG and competitors.

**B.      Rinn's Employment at EAG and her Obligations to Protect EAG's Trade Secrets and Confidential Information**

19.     Rinn was hired by EAG on July 10, 2023, as a PJS Group Aviation Sales Executive for EAG's wholly owned subsidiary, Private Jet Services, LLC ("PJS").

20.     PJS is a Florida limited liability company, with its principal place of business in Miami Beach, Florida.

21.     PJS acts as an agent for its clients in negotiating and facilitating transportation with duly licensed direct air carriers.

22.     Rinn's job responsibilities were related to providing services to customers in her assigned group. These responsibilities included: prospecting outbound leads to garner new clients; setting client visits; maintain existing accounts; educating and informing third party resellers on PJS products and services; discovering and cultivating new qualified sales prospects; creating proposals, quotes, and bids to win and attain trip contracts; and representing PJS at tradeshows, among other responsibilities.

23.     As a condition of her employment with EAG, Rinn entered the NDA.

5

24.     Section 4 of the NDA provides certain acknowledgements by Rinn, including that during the course of her employment, Rinn would be granted and have access to EAG's Confidential Information. (Ex. A at § 4(a)(i)). Rinn also acknowledged that the definition of Confidential Information in the NDA is not exhaustive (*id*. at § 4(a)(ii)), and that EAG has invested, and continues to invest, substantial time, money, and specialized knowledge into developing its resources including creating a customer base, generating customer and potential customer lists, as well as other items, in order to create a competitive advantage over others in the field of business. (*Id*. at § 4(a)(iv)).

25.     Moreover, in consideration for Rinn's employment and continued employment by EAG, as well as in consideration of Rinn's access to and use of EAG's resources, Rinn agreed to the following:

> For a period of time beginning from the date of [Rinn]'s employment by [EAG] and continuing after the termination of [Rinn]'s employment by [EAG] until such time that [EAG]'s Confidential Information has become public knowledge other than as a result of [Rinn]'s breach of this [NDA], [Rinn] agrees:
>
>> i.   not to, in any capacity, directly or indirectly, use, disclose, publish or make available to any person or entity any Confidential Information, except as may be necessary on behalf of [EAG], on a "need to know" basis, in the ordinary course of performing [Rinn]'s duties on behalf of [EAG]; and
>>
>> ii.  not to, in any capacity, directly or indirectly, access, use or copy any Confidential Information, or remove any Confidential Information from the premises or control of [EAG], except as required in the performance of [Rinn]'s duties to [EAG].

(*Id*. at § 4(b)).

26.     Rinn also acknowledged that EAG operates in a highly competitive environment, and that EAG's Confidential Information and customer goodwill is fundamental to its success and competitive position. (*Id*. at § 5(a)(i)).

27.     Rinn additionally agreed that:

For a period of thirty-six (36) months immediately following the termination of [Rinn]'s employment with [EAG], or, if held to be unenforceable by a court of lawful jurisdiction, such shorter period allowed under applicable law, [Rinn] agrees not to directly or indirectly solicit, contact, communicate or meet with [EAG]'s customers or prospective customers for the purpose of offering or accepting goods or services similar to or competitive with the goods or services offered by [EAG].

(*Id*. at § 5(c)(i)).

28.     The NDA further provides that "[f]or clarity, [Rinn]'s non-solicitation of [EAG]'s customers or prospective customers shall only apply to: (i) such customers or prospective customers with whom [Rinn] had direct or indirect contact during [Rinn]'s employment with [EAG]; and (ii) such customers or prospective customers who first became known to [Rinn] during [Rinn]'s employment with [EAG]." (*Id*. at § 5(c)(ii)).

29.     Also as a condition of her employment, Rinn received, read, and signed certifications of receipt and understanding regarding EAG's Employee Handbook. Annexed hereto as **<u>Exhibit B</u>** is the Acknowledgement of Receipt and Understanding form confirming Rinn's receipt and understanding of EAG's Employee Handbook.

30.     The EAG Employee Handbook is provided to all employees and sets forth an outline of guidelines, procedures, and rules of engagement for all EAG employees. Among other information, the EAG Employee Handbook states that employees of EAG, such as Rinn, may have access to, work with, or develop inventions, valuable information and materials relating to EAG business that are not known or available outside EAG.

31.     Moreover, the EAG Employee Handbook states that "[t]o retain its value, this information must be kept confidential within EAG." (Ex. B at p. 17).

32.     The EAG Employee Handbook also states that in addition to employees executing "non-competition, employment agreements and/or agreements in which they agree not to disclose

any [EAG's] confidential or proprietary information[,] . . . each employee recognizes through the receipt of [the EAG] Handbook his or her obligation to protect the Company's confidential or proprietary information during employment and after he or she leaves the Company for any reason." (*Id.*).

33.     The EAG Handbook then provides that:

Employees are strictly prohibited from downloading or copying any [EAG] information, including but not limited to customer lists and information, onto removable storage devices or email, and non-[EAG] email in particular, for non-[EAG] related purposes without express prior approval from the CEO of [EAG]. Any [EAG] Information and any electronic data accessed by either a [EAG] or personal device is considered confidential and proprietary information.

(Ex. B at pp. 17-18).

34.     Notably, employees agree to hold EAG's "confidential and proprietary business information in the strictest confidence" and that "during his or her employment with [EAG], and at all times after termination for whatever reason, the employee will not, in any capacity, directly or indirectly, use, disclose, publish or make available to any person or entity any of [EAG's] or its affiliates' confidential and proprietary business information, except such as may be necessary on behalf of [EAG], on a 'need-to-know' basis, in the ordinary course of performing his or her duties as an employee of [EAG]." (Ex. B at p. 18).

35.     As provided in the EAG Employee Handbook:

For purposes of these policies and the Nondisclosure and Restrictive Covenant Agreement, confidential and proprietary information means information of commercial value or other utility in the business in which [EAG] is engaged, and all information which, if disclosed without authorization, could be detrimental to the interests of [EAG], including but not limited to: customer lists, prospective customer lists, databases, information encompassed in all proposals, government bid materials, marketing and sales plans, financial information, costs, pricing information, vendor information, customer preference information, computer programs (including without limitation source code, object code, algorithms and models), and all methods, concepts, know-how or ideas in or reasonably related to

the business of [EAG], affiliated entity or any entity in which [EAG] has a controlling interest.

(Ex. B at p. 18).

### C.      Theft of EAG's Trade Secrets and Confidential Information

36.     At approximately 9:10 a.m. on February 9, 2024, EAG client TE, contacted PJS's Regional Vice President Vanessa Pyle regarding a flight request. Throughout the day on February 9, 2024, TE and Ms. Pyle went back and forth regarding the size of the plane, as well as the number of passengers that would be accompanying TE on the trip.

37.     Approximately twenty-four hours later, at 10:07 a.m. on February 10, 2024, TE received an email from one of EAG's competitors, Monarch Air Group, LLC ("Monarch Air Group") regarding a flight request—the same flight request submitted to EAG, including details that TE had submitted to Ms. Pyle the day before. The Monarch Air Group email included information regarding the departure city, arrival city, date, and time the flight was to be taken, as well as the number of passengers on the trip. TE had never contacted Monarch Air Group, directly or indirectly, to request a quote for this flight.

38.     Thereafter, at 10:24 a.m. on February 10, 2024, TE received an email from Daria Rossinskaya, Account Executive at Monarch Air Group stating that she would be TE's point-of-contact at Monarch Air Group and inquired whether TE had any time for a "quick call."

39.     Minutes later, TE forwarded Ms. Rossinskaya's message to Ms. Pyle, stating that the Ms. Rossinskaya was calling and texting, and was wondering if she was responding to his upcoming flight.

40.     Additionally, at 10:10 a.m. on February 10, 2024, PJS client CH received an email from fly@monarchairgroup.com regarding a flight request CH had made to PJS. Thereafter, at 10:21 a.m. on February 10 and 12, 2024, Ms. Rossinskaya emailed CH regarding this flight

request. CH did not respond. CH had not contacted Monarch Air Group regarding the flight request previously made to PJS.

41.     Similarly, another client of EAG, SP, confirmed to EAG that Monarch Air Group had reached out to this client recently regarding a flight request also made to EAG.

42.     According to Monarch Air Group's website, Monarch Air Group provides on-demand air charter and long-term aircraft leases across the globe.[1] Monarch Air Group is a competitor of EAG and has no relationship to EAG.

43.     On February 8, 2024, at 2:13 p.m., CS, another customer of EAG, received a response to a flight request that CS had submitted to EAG. This came from Alex Kowtun, Vice President of Sales, at JetCharter.com.

44.     JetCharter.com is another competitor of EAG and has no relation to EAG.

**D.      EAG's Internal Audit and Termination of Rinn**

45.     Immediately upon learning of these incidents of contact being made to EAG customers, EAG underwent an internal audit of its systems, including SugarCRM, user activity data, and Controlio user activity data.

46.     The primary purpose of the internal audit was to determine from where this customer information was being viewed, by whom, and how it was being disseminated to competitors of EAG. This analysis was done under the direction of the Chief Executive Officer, the Chief Information Officer, the General Counsel, and the President of EAG.

47.     SugarCRM is the customer relationship management software used by EAG. SugarCRM contains customer lists, prospective customer lists, databases, information encompassed in all proposals, government bid materials, marketing and sales plans, financial

---

[1] https://monarchairgroup.com/about-us/ (last visited July 2, 2024).

information, costs, pricing information, vendor information, customer preference information, all of which are EAG trade secrets, confidential, and proprietary.

48.     It became apparent from a review of SugarCRM, which contains many of EAG's trade secrets, that Rinn was accessing the "Opportunities", "Accounts", and "Contact" records of those customers contacted by competitors in SugarCRM.

49.     Rinn's access to these data fields served no legitimate business purpose as Rinn had no need to access such information owing to the fact that none of the customers referenced above were Rinn's clients, nor did she have authority to review such information in the course of her employment.

50.     To a certainty, Rinn did not have authority to disclose the Information to outside parties such as Monarch Air Group and Jetcharter.com. Rinn's receipt, review, acknowledgement, and understanding of the EAG Employee Handbook and signing of the NDA evidences her knowledge and acceptance of the non-disclosure of the Information.

51.     Notably, Rinn accessed and viewed CH's information in SugarCRM, including the account, contact information, and requested trip multiple times on February 9, 2024, and then again on February 10, 2024—the same day that CH was contacted by Monarch Air Group.

52.     The internal audit also confirmed that Rinn had accessed TE's information, as well as the requested flight in SugarCRM on February 10, 2024. Notably, this was also the same day that TE was contacted by Monarch Air Group.

53.     Moreover, on February 3, 2024, and February 6, 2024, Rinn viewed SP's account, days before SP was contacted by Monarch Air Group.

54.     And on February 8, 2024, February 9, 2024, and February 11, 2024, Rinn accessed the information of CS, as well as the requested flights in SugarCRM.

55.     The common connection between those customers contacted by EAG's competitors and Rinn's access of those customers' information in SugarCRM prompted EAG to take action. EAG management reviewed Rinn's unauthorized activity that took place on Saturday, February 10, 2024, on SugarCRM. The data shows significant activity by Rinn on accounts that she had no reason or authority to access.

56.     Thereafter, EAG's management also reviewed Controlio data.

57.     Controlio is an employee monitoring software that provides employers insights into daily workflows without infringing on employee privacy.

58.     Controlio gauges employee productivity based on mouse/keyboard interactions and the types of applications/websites with which employees engage.

59.     The Controlio data as to Rinn's EAG registered device(s) shows no activity on February 10, 2024, despite that the SugarCRM activity plainly shows Rinn was accessing certain customer's information.

60.     Thus, upon information and belief, Rinn was accessing the Information from a device that was not issued to her by EAG.

61.     Specifically, EAG's records reflect that the IP address that was used for the kaci.rinn@pjsgroup.com user account to access SugarCRM on February 10, 2024 was the same IP address that was used to access SugarCRM on February 8, 2024 and February 9, 2024, which indicates that the activity on February 10, 2024 was coming from the same location, despite that this activity was not from a Controlio registered device.

62.     As noted above, Rinn was not authorized to access information regarding other group's customer information or inquiries.

63.     Upon reviewing the above-mentioned information and data, as well as the

immediate contact of EAG/PJS's clients after Rinn's accessing of such information, it became apparent to EAG management that Rinn was accessing the Information without authorization, stealing such information, and then disseminating the data to EAG's competitors, such as Monarch Air Group.

64.     Accordingly, upon immediately learning of the events relating to Rinn's unauthorized access of the Information and dissemination of same, Rinn's employment with EAG was terminated effective February 13, 2024. A copy of the Notice of Termination is attached hereto as **Exhibit C**.

    E.    **Rinn's Actions Have Caused and Will Continue to Cause Irreparable Harm to EAG**

65.     As previously alleged herein, the Information is a core and highly valuable aspect of EAG's business. The Information related to customer lists, prospective customer lists, customer airplane preferences, databases, historic and dynamic pricing per customer, information encompassed in all proposals to customers and prospective customers, government bid materials, marketing and sales plans, financial information, costs, pricing information, vendor information, customer preference information, computer programs (including without limitation source code, object code, algorithms, and models), and other highly confidential information was developed at great expense of time, money and effort, and lies at the heart of its business.

66.     EAG has already suffered damages as a result of Rinn's wrongful conduct and it continues to suffer such damage. Rinn's conduct has already caused EAG irreparable harm and will continue to do so if not stopped. The misappropriated Information includes related customer lists, prospective customer lists, customer airplane preferences, databases, historic and dynamic pricing per customer, information encompassed in all proposals to customers and prospective customers, government bid materials, marketing and sales plans, financial information, costs,

pricing information, vendor information, customer preference information, computer programs (including without limitation source code, object code, algorithms, and models), and other highly confidential information that Rinn had access to via her former employment with EAG.

67.    Rinn's disclosure of such Information to EAG's competitors causes irreparable harm.

68.    The confidential and trade secret information Rinn illegally accessed is highly-sensitive and provides a competitor, like Monarch Air Group, with a significant unfair advantage, including in connection with prospective customer lists, customer airplane preferences, databases, historic and dynamic pricing per customer, information encompassed in all proposals to customers and prospective customers, government bid materials, marketing and sales plans, financial information, costs, pricing information, vendor information, customer preference information, computer programs (including without limitation source code, object code, algorithms, and models), among other information and items.

69.    The damages from such irreparable harm cannot be calculated with precision and cannot be adequately compensated by money damages alone.

70.    Rinn's acts have been deliberate, willful, intentional, and in bad faith.

71.    Unless Rinn's wrongful conduct is enjoined, EAG will continue to suffer irreparable injury that cannot be remedied at law.

## COUNT I
### Misappropriation of Trade Secrets Under the Defend Trade Secrets Act of 2016

72.    EAG re-alleges and incorporates Paragraphs 1 through 71 above as if fully set forth herein.

73.    The Information, including but not limited to customer lists, prospective customer lists, customer airplane preferences, databases, historic and dynamic pricing per customer,

information encompassed in all proposals to customers and prospective customers, government bid materials, marketing and sales plans, financial information, costs, pricing information, vendor information, customer preference information, computer programs (including without limitation source code, object code, algorithms, and models), and other highly confidential information that Rinn had access to via her former employment with EAG, are trade secrets which EAG has taken reasonable measures to keep secret and from which EAG derives independent value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from the disclosure or use of the information.

74.     As detailed above, the Information is used in furtherance of all aspects of EAG's business, especially in working with its customers and recording the individual customer's unique preferences. This information was developed by EAG over a substantial period of time through substantial costs and investment and gives EAG a competitive advantage in its business.

75.     Rinn has misappropriated the Information in one or more of the following ways:

a)      By acquiring the Information through improper means (e.g., misrepresentations, breach or inducement of a breach of a duty to maintain secrecy);

b)      By disclosing and/or using the Information without EAG's consent;

c)      By disclosing and/or using the Information without EAG's consent for her own commercial benefit while knowing, or having reason to know, at the time of the disclosure and/or use, that the Information was acquired through improper means;

d)      By disclosing and/or using the Information without EAG's consent for her own commercial benefit while knowing, or having reason to know, at the time of the disclosure and/or use, that the Information were acquired under circumstances giving rise to a duty to maintain the secrecy and limit the use of those trade secrets; and

e)      By disclosing and/or using the Information without EAG's consent for her own commercial benefit while knowing, or having reason to know, at the time of the disclosure and/or use, that the Information was derived from or

through a person who owed a duty to EAG to maintain the secrecy and limit the use of those trade secrets.

76.     Rinn took such actions willfully, maliciously, and/or in reckless disregard for EAG's rights, in that Rinn knew, or had reason to know, pursuant to the terms of the EAG Employee Handbook and the NDA, that Rinn was not authorized to disclose the Information or use the Information in competition with EAG or for Rinn's own commercial benefit.

77.     As a result of Rinn's misappropriation of the Information, EAG has suffered and will continue to suffer actual damages, and/or Rinn has been unjustly enriched, in an amount to be determined at trial.

78.     As a result of Rinn's misappropriation of the Information, EAG has suffered and will continue to suffer irreparable harm if Rinn's misconduct is not enjoined.

79.     Pursuant to 18 U.S.C. § 1836(b)(3)(C), EAG is entitled to exemplary damages for Rinn's willful and malicious misappropriation of the Information.

80.     Pursuant to 18 U.S.C. § 1836(b)(3)(D), EAG is entitled to recovery of its attorneys' fees because of Rinn's willful and malicious misappropriation of the Information.

<u>**COUNT II**</u>
**Misappropriation of Trade Secrets under the New Hampshire Uniform Trade Secrets Act**
**(NH Rev Stat § 350-B)**

81.     EAG re-alleges and incorporates Paragraphs 1 through 71 above as if fully set forth herein.

82.     This is a cause of action for misappropriation of trade secrets under the New Hampshire Uniform Trade Secrets Act, NH Rev Stat § 350-B, based on the wrongful misappropriation, use, and/or disclosure of the Information, including but not limited to customer lists, prospective customer lists, customer airplane preferences, databases, historic and dynamic pricing per customer, information encompassed in all proposals to customers and prospective

16

customers, government bid materials, marketing and sales plans, financial information, costs, pricing information, vendor information, customer preference information, computer programs (including without limitation source code, object code, algorithms, and models), among other highly confidential information that Rinn had access to via her former employment with PJS/EAG.

83.     The Information is a trade secret because it derives independent economic value from not being generally known to the public or to others who can obtain economic value from their disclosure or use.

84.     Rinn gained access to the Information in the course of her employment relationship with EAG and was under a contractual and fiduciary obligation to maintain the secrecy of the Information during her employment with EAG and thereafter.

85.     In violation of her obligations to maintain the secrecy of the Information, Rinn improperly acquired and/or disclosed the Information.

86.     EAG took reasonable precautions to protect the Information, and Rinn was subject to obligations to maintain its secrecy.

87.     Rinn has used and/or disclosed the Information, without EAG's consent or permission, in an attempt to benefit herself.

88.     Rinn has used and/or disclosed the Information, maliciously and in willful and conscious disregard of the rights of EAG.

89.     As a direct and proximate result of Rinn's willful, improper, and unlawful use and/or disclosure of the Information, EAG has suffered and continues to be damaged. EAG will continue to be irreparably damaged unless Rinn is enjoined from further use and disclosure of the Information.

90.     The aforementioned acts of Rinn wrongfully misappropriating the Information

were and continue to be willful and malicious, warranting an award of exemplary damages, as provided by NH Rev Stat § 350-B:3(II), and an award of attorneys' fees, as provided by NH Rev Stat § 350-B:4.

### COUNT III
### Breach of Contract

91.     EAG re-alleges and incorporates Paragraphs 1 through 71 above as if fully set forth herein.

92.     The NDA was executed between EAG and Rinn on or around July 10, 2023, as a condition of Rinn's employment with EAG.

93.     The NDA constitutes a valid and enforceable contract between EAG and Rinn.

94.     Pursuant to the NDA, Rinn agreed, among other things, not to use or disclose the Information, except as expressly authorized, and not to retain such information following her employment. Rinn further agreed to return any and all EAG property, including any confidential information, upon her termination.

95.     Pursuant to the NDA, these contractual obligations survived Rinn's employment at EAG.

96.     Pursuant to the NDA, Rinn agreed that a breach of the Agreement would entitle EAG to injunctive relief, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that EAG may have.

97.     Pursuant to the NDA, Rinn agreed that, in the event of a legal proceeding to enforce the terms of the NDA, the prevailing party shall be able to recover its reasonable attorneys' fees and costs against the other party.

98.     The foregoing covenants in the NDA were intended and necessary to protect EAG's legitimate business interests, including in its goodwill, and the Information.

99.     EAG has fully performed all of its obligations and satisfied all conditions for performance under the NDA.

100.    Rinn has breached the NDA, including by: (a) improperly using and/or disclosing the Information; and (b) failing to return all of the Information.

101.    Rinn's acts have been deliberate, willful, intentional, and in bad faith, with full knowledge and in conscious disregard of his duties under the NDA.

102.    Because of Rinn's breaches, EAG has been harmed. In addition, EAG has been seriously and irreparably damaged by Rinn's breach of her contractual obligations to maintain the Information in secrecy, as was required by the NDA.

103.    As a foreseeable, direct and proximate result of Rinn's breaches of contract, Rinn has been unjustly enriched and EAG has been injured and damaged. Accordingly, EAG is entitled to money damages to compensate it for the losses caused by Rinn's breaches of the NDA.

104.    EAG has also suffered irreparable harm as a result of Rinn's breaches of her contractual obligations to EAG and will continue to suffer irreparable injury that cannot be remedied at law unless Rinn, her agents, and all other persons acting in concert with her, are enjoined from engaging in any further such breaches.

### COUNT IV
### Breach of the Implied Covenant of Good Faith and Fair Dealing

105.    EAG re-alleges and incorporates Paragraphs 1 through 71 above as if fully set forth herein.

106.    Implied in every New Hampshire contract is an obligation that the parties act in good faith and deal fairly with one another in the inducement and performance of their contractual obligations.

107.    Rinn has breached this implied covenant by acting in bad faith in performance of

her obligations pursuant to the NDA. Although Rinn agreed to maintain the secrecy of the Information, Rinn disclosed the Information to EAG's competitors.

108.    As a direct and proximate result of Rinn's breaches of the implied covenant of good faith and fair dealing, EAG has been damaged.

109.    As a result, EAG is entitled to recover damages and injunctive relief.

## DEMAND FOR ATTORNEYS' FEES AND COSTS

110.    The NDA at issue in this litigation provides that the prevailing party is entitled to recover its attorneys' fees and costs. EAG hereby demands that it be reimbursed by Rinn for all costs and expenses (including attorneys' fees) relating to the prosecution of this action.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Elevate Aviation Group, LLC demands judgment against Kaci Rinn for:

A.    Judgment in favor of EAG and against Rinn on all claims for relief alleged herein;

B.    Preliminary and permanent injunctive relief that orders, enjoins, and restrains Rinn and all persons acting in concert or participation with Rinn, as follows:

1.    prohibits the use, disclosure, transmission or continued possession for any purpose of EAG's Trade Secrets and/or Confidential Information;

2.    compels the return to EAG of any and all records, information and/or documents in any form, received or removed from EAG by Rinn, including all copies, within five (5) days from the entry of this Court's Order. This requirement includes all records, information or documents, in any form, created by Rinn, or anyone acting in concert with Rinn, based on documents or information received or removed from EAG by Rinn;

3.    prohibits any other unauthorized use or disclosure of the EAG Trade Secrets or Confidential Information in connection with any goods or services provided by Rinn or any persons acting in concert or participation with Rinn;

4.    prohibits the use of EAG's Trade Secrets or Confidential Information in any other manner to Rinn's benefit or to the detriment of EAG;

5.    prohibits the direct or indirect disclosure to any person or entity of the EAG Trade Secrets or Confidential Information; and

6.    orders Rinn to turn over to the Court any proceeds that Rinn, or any persons acting in concert or participation with Rinn, has received from the misappropriation of the EAG Trade Secrets or Confidential Information, and other unlawful conduct, such proceeds to be held in constructive trust until the conclusion of this litigation.

C.    An order requiring Rinn to account for all gains, profits and advantage derived from her misappropriation of EAG's Trade Secrets and Confidential Information.

D.    An order requiring Rinn to disgorge all profits earned from her unlawful conduct.

E.    An order awarding actual and compensatory damages according to proof at trial.

F.    An order awarding EAG costs of suit, pre-judgment and post-judgment interest, and reasonable attorneys' fees.

G.    That this Court award such further relief to which EAG may be entitled under the circumstances and which this Court deems just and proper.

Respectfully submitted,
ELEVATE AVIATION GROUP, LLC

By its Attorneys,
SHAHEEN & GORDON, P.A.

Date: July 2, 2024

/s/ *Olivia F. Bensinger*
Olivia F. Bensinger (NH Bar #274145)
107 Storrs Street
Concord, NH 03302
(603) 225-7262
obensinger@shaheengordon.com

AND

VENABLE LLP
100 Southeast Second Street
Miami Tower, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310

By:     /s/ *Elizabeth McIntosh*
          Elizabeth McIntosh
          Florida Bar No. 1011555
          EGMcIntosh@Venable.com
          *Pro Hac Vice Admission Forthcoming*